Next one, Northwest Center for Alternatives to Pesticides versus DHS. And counsel, as you're getting set up, I just want to let both sides know that I'll speak for myself. I am particularly interested in the mootness issue. So there are a lot of issues in this case. And we'll make sure that you spend at least some time on that. I agree with that as well. I agree with that too. That is definitely where we're going to focus. May it please the court, my name is Brenna Bell. And I'm here on behalf of appellants, collectively referred to as Northwest Center for Alternatives to Pesticides. And with me at counsel's table is Kelly Simon. I plan to reserve five minutes for closing remarks. And the heart of today's argument is that this case deserves a stay in court, at the very least to delve into the legal and factual questions that came up in the government's motion to dismiss. And barring the courtroom door to these appellants, which the federal government would have you do, leaves important questions unanswered and access to justice denied. So today, we ask you to open this door. I was going to briefly mention the three other arguments and then go into mootness. I think I'll flip that. Because like you, when I read the briefing, when I read the reply and mootness came back on the table, I thought, oh, this is where the action is. Is this case still alive? And unsurprisingly, we would argue that it very much is. So I'll start there and then go back and briefly touch on the other three arguments that the government raises on its motion to dismiss. So the government's primary argument is that because Operation Diligent Valor is no longer active, the court cannot provide appellants with the requested release. But this misunderstands the theory of mootness, especially mootness claims arising out of NEPA concerns. So to start, a case does not become moot just because the specific relief that the plaintiff initially asked for is no longer available. As this court has articulated, the question of mootness turns on a different question, whether there is any available relief left to appellants. And there are many NEPA cases where this court has found effective relief is possible after the challenge project is complete. And perhaps the court's approach is best summed up. You've got a great quote in Oregon Natural Resources Council v. Bureau of Land Management, where you found, quote, when evaluating the issue of mootness in NEPA cases, we have repeatedly emphasized that if the completion of the action challenged under NEPA is sufficient to render the case non-justiciable, entities could merely ignore the requirements of NEPA, build its structures before the case gets to court, and then hide behind the mootness doctrine. And such result is not acceptable. Right, but don't the facts there deal with a structure which could be removed as opposed to something that's dissipating in the environment? They could. There are a lot of different NEPA claims with facts. I think our claim is a little bit more analogous to neighbors v. Cutty Mountain, where there was a timber sale that was litigated, and it had already been logged. And they were discussing mootness as related to something that was already over. Or Northwest Environmental Defense Center v. Gordon, which was about salmon fishery, and the salmon fishing season had already happened. And in both of those, the court found that there was still effective relief available to the plaintiffs. So just because the thing had already happened and could not be undone did not preclude effective relief. So that, I think, is the heart of the question. But doesn't that depend on the sort of totality of the circumstances of the particular alleged harm that's at issue? Absolutely. If you have a recurring fisheries issue or a timber management issue, I understand that in terms of definiteness might carry the day. I'm not so sure about the sort of less predictable component of what happened here. Yeah, I think mootness does really turn on the facts and is a case-by-case decision. So in those cases, the thing had already been done. And the court found that there were opportunities to mitigate. In Neighbors v. Cuddy Mountain, it was perhaps to mitigate the impacts to old growth that happened because of that. And in the salmon fishery, it was the idea that it will happen again and they could change things to mitigate. But I'd like to get into the nature of the injury here, because I think it's really important to understand why there is still ongoing injury the plaintiffs could experience effective relief to. So we detailed it in our reply brief because the mootness only came up in the answer, that appellants would still experience significant effective relief from DHS by undertaking an analysis of human and environmental health impacts from Operation Diligent Valor, because such a NEPA analysis would detail what chemicals were used, in what concentrations, and what both the human and ecological impacts to that exposure are. And this information would enable appellants to make informed decisions about their health in seeking treatments to impacts from past exposure. And I want to take a minute on this. That sounds more like, NEPA is not FOIA, right? Correct. NEPA is a procedural statute that is supposed to require agencies to gather information to provide better agency decision making. It's not a free-floating way for the public to gather information. So if that's all you have, why is that enough to save a NEPA case from mootness? I would suggest that NEPA has two facets. One is to have the government make better decision making. But the second is to inform the public what the government is doing and give them a chance to engage in that decision making. What the government is doing, not what the government has already done in the past, right? Isn't that an important distinction? I think it is that NEPA is typically a forward-looking approach. It's typically a forward-looking process. And in this case, that didn't happen, right? So we didn't get NEPA analysis before the chemical munitions were put out as the law would typically have. DHS itself has provisions for NEPA after the fact. CEQ has positions for or has regulations for NEPA after the fact. Because, if I may go back to the nature of the injury, there is still ongoing injury that would be addressed not just by FOIA information. And we'll point out, people have tried to FOIA this information. Even our federal senators tried to get this information. We have not ever successfully had access to- Are you saying you don't know the chemical composition of the tear gas at issue? What we don't know, what we have- I will say that what people have been able to get is a partial list of some of the types of chemical munitions used. It includes no analysis, not in the concentrations, no impacts to human health, and no ability for people to engage with that information like they would in NEPA. So I'm going to go back to the harms, because I think this is important. The question is, is there any existing relief that could be derived from a NEPA analysis? And I say yes on two major points. One is human health issues that are still alive. And in our briefing, we talked about how these chemical munitions lead to a series, could lead to a series, of very long-term health impacts. And one that was particularly devastating, I would say, for our members and for other people is the impact to reproductive health for the women who are tear gassed. And it is a very scary thing to have your reproductive health be affected by unknown chemicals. And people are very concerned to know, they have an ongoing concern to know, what were the impacts of that? What was I gassed by? Will this have long-term impacts on my reproductive health? We don't know. I would love for there to be a NEPA analysis where the government looks at what it did, gathers that information, and tells us, no, you're OK. But it might not be that. Just the sort of civil rights laws that are available wouldn't provide that same relief with a lot more specificity. And injury, in fact, would not be an issue. And we would be dealing in the sort of real world of alleged concrete harms. I know of no such law in which the government looks at the impacts to the health and human environment in the same way that NEPA allows them to do. I don't see another avenue for this. But in civil rights context, an aggrieved client or class could seek, I don't know about class, but an aggrieved individual could certainly seek all of that information through normal discovery and relay it to the specific alleged harm in this case. Two things. One, that might be possible, but I don't think that that necessarily moots this case today. And second, the thing that we would like to see is the government do this analysis. So discovery imagines that that information is already out there and that you can just get it. FOIA imagines that the information is out there and we can just get it for clients or for the members of the public. But what NEPA says is the government has to do that analysis, has to create that analysis. And to the best of our knowledge, they have not done this. So we had this novel major federal action with extreme environmental and human health impacts for which the information is still missing. And there are very real, tangible health impacts to humans and potentially the environment, like Chapman Square, which is the area right in front of the courthouse, was doused with toxic chemicals in concentrations that we do not know. A NEPA analysis could provide for mitigation of ongoing toxicity in the soil. It's not just about getting information, even though that information would provide relief, because people could make human health decisions about their own existing health, knowing what they were exposed to and what the impacts of those are. It could also provide environmental relief. If we knew- Ms. Bell, if I can interrupt you, a moment ago you said this is a major federal action. And I guess this is partially a mootness question, but maybe partly a final agency action question. Could you clarify what specifically is the action that you're challenging here? As pled, the action that we're challenging is Operation Diligent Valor. Well, so that's, I mean, I guess that's my, that leads to the next question, which is, if the attorney general or secretary of DHS had just given a press conference and said, there's a lot happening in Portland, gonna send some extra people there. I'm not sure anybody would think that that was a reviewable final agency action. And so, in fact, what they did is they gave it this, absurdly grandiose name as if it were the Inchon Landing or something. But at the end of the day, like, isn't all they did send a bunch of people to Portland? And if that's what Operation Diligent Valor is, like, why is that a reviewable action? Well, I think that that definitely goes to a question of fact. What did in fact happen? I would love to see the agency record of decision on this case. And we could see what, where their decision-making was. And I think we need that record of decision in order to answer your question, which is why on that, because if you're, sorry, you're going to that 12B1 question is, is there a final agency action? I think it's hard to answer. It's nigh impossible to answer before any development of the facts have happened. But how, you have to know what it is that you're challenging in order to challenge a federal action. I mean, I understand how you can under the APA or NEPA come in and say, the government's doing something. We're not sure what they're up to, but we want to review it. Well, we knew what we were up, what they were up to. It was very clear that they had, that Department of Homeland Security made a plan under the tact to go to Oregon to quell protest. They did give it a funny name, but it was a discrete agency action that they undertook. And because of that- But there was no specific agency action about methodologies. It was basically additional law enforcement, federal law enforcement were tasked with assisting local law enforcement and doing whatever they felt was appropriate, obviously with guardrails of constitutional law as well. You know, I have no information that said, go there and use, you know, 5,000 gallons of tear gas. And I would think that when you're dealing on a sort of granular level, granular level rather, with what essentially is, you know, the exercise of police power, that you just don't get to automatically elevate that to an agency action. I would argue two things in response. The first is that DHS itself, in their NEPA handbook, contemplates undertaking NEPA analysis for actions such as this. They have it both in their regular analysis, they say before we take an action, we should do it, and also in their emergency regulations. And so they contemplate that there will be situations where they are going to have a major impact on the human health and the environment. Probably most DHS law enforcement actions do not end up having a major human health impact. This one did. And so DHS contemplates that it does. But also in this jurisdictional question on final agency action. That's not accurate, is it? I mean, it doesn't contemplate that this action will. It just is a general grant of authority to DHS for recognition that under appropriate circumstances, not defined, there may be a requirement to take a look at the environmental considerations. Well, the DHS manual says that in most considerations, most DHS actions, NEPA analysis is necessary, at least determining whether or not to do it. And so both their regulations set it up. NEPA itself says that when the federal government undertakes an action, it needs to look at the environmental regulations. But I would like to point you to the only case that we could find that's analogous to this. Because I'll admit, this is a novel case. And that's Forest Service Employees for Environmental Ethics around the use of chemical fire retardants, where it looked at whether or not there is a final agency action when individual fire bosses and individual people who are fighting fires choose to drop chemical retardants. And it found that there is. And so again, since we're looking at this as a jurisdictional issue, we would like to have the opportunity to develop those jurisdictional questions with facts and the record back in district court. I'm going to reserve the rest of my time for rebuttal. Very well. And while you're listening to your opponent, I'm going to give you a question to think about for rebuttal. The question I was going to ask is essentially, don't answer it now, I'm just going to give you the question, is under your theory, could someone today, for example, file a similar lawsuit about January 6th, 2021, or Seattle 1999? Or are there previous ones for the same theory underneath, but we want to understand the chemicals and methods that were used? That was going to be my question. Let's just hear from the government. Good morning, and may it please the court. Ariel Jeffries on behalf of Federal Appellees. Plaintiffs seek to bring a NEPA challenge to a law enforcement operation that sent temporary reinforcement personnel to Portland two years ago. That operation had wound down by late October of 2020 when plaintiffs brought their complaint, and at that point was not causing plaintiffs any concrete or imminent injury. That operation also officially ended almost a year and a half ago, rendering plaintiffs' appeal moot. I will also begin with mootness, because that is where interest in this case lies. First of all, as I explained, Operation Diligent Valor, which, as we just heard Ms. Bell explain, is, in fact, the final agency action that plaintiffs are challenging. That operation ended a year and a half ago on May 2nd, 2021. As such, this court cannot provide any effective relief. In addition, there are no additional law enforcement personnel above and beyond the steady state FPS. Are you conceding that it is a final agency action? Because that's what I just heard. No, Your Honor. The operation that they challenge, which is the law enforcement operation sending additional reinforcement personnel to Portland, ended on May 2nd. That is what I was trying to express. In addition, there are no additional law enforcement personnel in Portland, and there haven't been use of riot control agents in Portland. Also, over a year. Now, plaintiffs' argument that they are exempt from the constitutional limits of mootness because this is a NEPA case misunderstands NEPA and this court's precedents. Effective relief for a NEPA violation is ultimately an injunction against the proposed action. Remember, NEPA claims are brought under the APA because NEPA doesn't provide its own right of action. And the remedy provided in the APA is invalidation of an agency action that is taken without following applicable law and procedures. So here, an APA remedy would be setting aside Operation Diligent Valor, which of course would have no effect. I'm so sorry to interrupt you. Would you mind just slowing down a little bit? Just coming through the video monitor, it's not crystal clear to me that I'm picking up everything you're saying. I'm sorry, yeah. What I was just saying is that an APA remedy here would be setting aside the final agency action, which plaintiffs contend is Operation Diligent Valor, which of course would have no effect, which is why their case is moot. Effective relief for a NEPA violation has to be tailored to the harm. Even if the court could order some sort of standalone NEPA analysis, NEPA remedies have to be tailored to the harm asserted. Courts don't order NEPA as a prophylactic or a punitive measure. Rather, the goal is to allow the government to consider the environmental effects of a proposed future action. It's not a remedial statute, as this court just explained. It's not FOIA. It can't correct past harms or the past effects of riot control agents in Portland. And this circuit's precedents cash out that understanding. In Penfold, this court held that because the court could not order mines unmined, the claim was moot, likewise in Native Village, the court held because the court could not order wells undrilled, the case was moot. The same is true here. In addition, this case is not. And what about the capable of repetition yet evading review issue? The capable of repetition yet evading review exception to mootness doesn't apply because plaintiffs are unable to show that the circumstances from the summer of 2020 are likely to occur. Those were a unique set of circumstances. Portland had sustained nightly protests for more than 100 days, and there were a large number of law enforcement officers in Portland. It's not reasonable to conclude that this unique set of circumstances is likely to happen again. Plaintiffs would have to show, first of all, that a particular protest is going to happen, second of all, that their members are likely to attend that protest, third, that there would be activities surrounding federal facilities, and fourth, that the government would again send additional law enforcement officers into Portland, and that those officers would have to result to the use of riot control agents, which plaintiffs simply have not been able to show. Therefore, this is not capable of repetition. Why does it have to be the same location with the same precise number of factors as opposed to the use of a chemical agent in large quantities? It doesn't have to be exactly the same location. It would have to be near federal facilities, presumably in Portland if that's where plaintiffs' members reside, or where the protest would presumably happen. It would have to be near a federal facility because the Federal Protective Service's role is protecting federal facilities, and any use of riot control agents would be in service of protecting those federal facilities. Unless there are further questions about mootness, I'll go ahead and discuss final agency action. Now, Operation Diligent Valor was the decision to send additional reinforcement officers in the summer of 2020, and that helped supplement the steady state Federal Protective Service presence in Portland. But deploying additional officers is not an agency action as the APA defines it, much less a final agency action. An agency action is defined in the APA very specifically as a rule, order, license, sanction, relief, the equivalent or denial thereof, or failure to act. Allocating resources and managing personnel decisions is not something that fits any of those categories. Rather, those sorts of personnel management decisions are a part of the department's day-to-day operations, which both the Supreme Court and this court have multiple times noted the APA does not permit review of, both in National Wildlife Federation or in this court in Wild Fish. If the Department of Homeland Security, I think as this court's questioning earlier indicated, were to decide today that it needed one additional FPS officer for the Portland region to fulfill its statutory duties, there would be no question, I think, that that sort of personnel decision would not be a reviewable final agency action. But this is different in degree and not kind. The principle fundamentally remains the same. But deploying additional officers does not determine rights or obligations or generate any sort of legal consequences. What about the distinction with the fire retardant case that was alluded to earlier? A couple of points there. First of all, FSEE was a district court decision. And that was a 706-1 case. The holding was fundamentally under 706-1, not 706-2, which is the kind of challenge we have here. And the portions that plaintiffs reference from FSEE say there is probably a final, I'm under the Bennett test. The holding is fundamentally a holding under 706-1, that a NEPA analysis is a discrete action that the agency was legally required to take. And then there's some dicta in the opinion about the concept that dropping certain chemical fire retardants could have practical consequences. Insofar as the court seemed to think in dicta that dropping chemical fire retardants having practical consequences satisfies the Bennett test, I would say that is flatly wrong, if that's how this court would like to read that opinion. And it's flatly contradicted by not only Supreme Court precedent, but this court's precedent in its dicta from a district court decision. So I wouldn't rely on that. In addition, this court has made it clear that particular practical physical consequences, even if immediate, do not meet Bennett's test. And I think that's clear from the text of Bennett. I understand the admonition that we shouldn't read Supreme Court opinions like dictionary definitions, but Bennett says legal consequences. What matters is that it binds rights or obligations, legal rights or obligations, or generates legal consequences. And the use of riot control agents does none of those things. And that's, of course, if you can even loop in the use of riot control agents into the definition of Operation Diligent Valor. But plaintiffs point to this use of riot control agents. But of course, that decision was made by individual officers and isn't agency action. It's individual officer action. And the case law is clear that the decisions need to be made by a person with decision-making power in the agency, not by individual officers. Plaintiffs try to get around this by pointing to the fact that even if the individual decision to use riot control agents was made by individual officers, the agency had a role in authorizing, training, and providing those weapons. But again, training of the officers, providing equipment is quintessentially a part of the day-to-day operations of the Department of Homeland Security. And may I ask, did Operation Diligent Valor  when it is appropriate to use these kinds of agents or in what quantity? No. Operation Diligent Valor was under Section 1315, which gives the police powers to the Federal Protective Service and the Department generally and allows designation. That was conducted under the general use of force policy, which you can find in the record, and of course, under constitutional limitations and the Supreme Court's precedents. But there was nothing about Operation Diligent Valor that changed use of force from the department. Unless this court has further final agency action questions, I'll move on. Go ahead. OK, I'll move on to standing, which is the last jurisdictional barrier here. Now, the standing analysis for associational standing is really a similar question to what we've already discussed with regard to capable of repetition, yet evading review in order to be eligible for perspective injunctive reliefs, plaintiffs would need to show that they're suffering a certainly impending future injury. But because that chain of speculation is so attenuated, even by the time that plaintiffs brought their complaint in late October, they could not show that an injury from additional law enforcement presence in Portland or even the use of riot control agents was certainly impending. At that point, the Department of Homeland Security presence had substantially diminished. DHS didn't use any riot control agents in August. Only on two occasions in September and then in October. And then at that point, plaintiffs bring their complaint. So an injury was not certainly impending. Nor do plaintiff organizations show organizational standing, which requires a diversion of resources, not just to spend on an interest, but in order to avoid a certainly impending injury and a frustration of their core mission. For this reason, even if the court believes that plaintiffs challenged a final agency action and there is some sort of effective relief available, this court should affirm because plaintiffs lacked standing when they initiated this lawsuit. Unless this court has further questions about the merits or anything else, I would ask that the court affirm the district court judgment or dismiss the appeal as moot. I'm looking to my colleagues on the screen. OK. If we dismiss the district court and dismiss without prejudice, presumably the petitioner could go back and attempt to refile, correct? That's correct. The district court dismissed without prejudice under 12B1. Very well. All right, thank you very much. Thank you. All right, I have a lot to say. I'll try and be articulate. First, that's a fantastic question. And I think that the main reasons that we could not go back and sue over the WTO protests are lack of standing, first of all. As counsel just pointed out, you need to have imminent threat of future injury or ongoing injury to bring that. We have both in this case. On October 18, as we pled, DHS used chemical munitions. On January 20 and 21, as plaintiffs pled, and you can see from our standing declarations, they once again did it. So we both had the sense that there was impending injury. There was injury in the fact after we filed. You need to have standing. You need injury at the moment you file, which is why I don't think we could actually go back and file again if you dismiss the case. Because I don't think we would have that same imminent threat of injury. That's not saying that this is possible of repetition, or that it's not possible of repetition, yet evading review. But I think for the facts of this case, the plaintiffs were injured in 2020, and again in 2021, intervening in that we filed this complaint. So we have showed what we need for standing. But the second question, like going back to your question about the WTO, it's not just standing, it's redressability, which brings us back to mootness. I think those cases would be moot, because it's not just information for information purposes only. It's information for active relief for ongoing existing problems, for a present interest in the case. And as I've mentioned, NCAP's members getting access to this information would allow them to make informed decisions about their health, both in seeking treatment from past exposure, and in making choices about whether or not to go to future protests where DHS might be present. DHS could also actively engage in mitigation efforts in the Willamette River or in soil. There are still things that could be done, that cannot be done, without the information that a NEPA analysis would give. There was effective relief available that does not exist for things that are wholly in the past. This is not wholly in the past. People are still very worried about what they were exposed to, in what concentrations, what the long-term things are. And no one knows. As far as we know, this is the first and only time that a civilian population has been exposed to this kind of chemical munitions in this concentration over this amount of time. No one has any idea what the impacts are. And the federal government has a statute that should prevent it from putting people in that situation. NEPA says the government needs to know what it's doing, and it needs to share that information with the public so they can make informed decisions. It is not too late to correct the fact that they did not do NEPA initially. I'd also just like to briefly mention that on the 12b1 challenge, we are in a situation where the merits and the jurisdiction are so intertwined that you should use the 12b6 standard to address the jurisdictional issue. As Safe Air for Everyone really got into this issue, if you don't do that, because we haven't had a chance to develop the facts, you will be making a premature merits decision with no record. So in the alternative, you could send us back to district court for an evidentiary hearing where we could get into that question, is this final agency action? But with what's before the court now, it's very hard for them to prove that it is not a final agency action. We just don't have the record. We don't have the facts. The district court relied on a declaration, but there was no chance for us to develop the body of evidence that we need to answer that question, was this a final agency action? And since it goes directly to the merits, it would be premature to get rid of it. And I'll just remind us that today the court is not deciding whether relief is appropriate for mootness, just that it is possible. If you think there is any way at district court we could develop the theory that there is still relief possible, please send us back. Do not bar the doors to these people. We want to know what they were poisoned with, what they can do about it, and how to move on from what was a very difficult time. So we ask that you reopen those doors. We're not seeking any injunctive relief. Not at this time, no. So that's what we ask. Thank you for your time and your consideration of this case. Thank you very much, counsel. Thank you to both of you for your briefing and argument. This matter is submitted.
judges: OWENS, MILLER, Pregerson